May it please the Court, Your Honors. Good morning. I'd like to reserve five minutes of my time for rebuttal. I'll be addressing the merits of the motion to dismiss. To the extent the Court has questions about the issue of reassignment on remand, my colleague Mr. Wright will address those issues. Counsel, I'll try to remind you when you have five minutes left. It's your obligation to watch the clock. I got the clock here. I'll try to keep an eye on it. Thank you. Thank you. Your Honor, I'll walk the Court through how Disability Rights Montana's complaint, the allegations in the complaint, satisfy all the elements of an Eighth Amendment deliberate indifference claim. But right at the start, there's one issue that I particularly want to emphasize and call the Court's attention to. And that is, in this case, this Court should hold that for purposes of pleading an Eighth Amendment claim against a Department of Corrections director or a prison warden, the very top officials in the system. It is obvious that placing prisoners with serious mental illness in solitary confinement exposes those prisoners to a substantial risk of serious harm. It's time to acknowledge this reality and this issue is squarely teed up in this case. If the Court were to hold that, it would go to two primary elements in a deliberate indifference claim, the objective element and the subjective element. With respect to the objective element, it's just the issue of viewed objectively, displacing prisoners with serious mental illness in solitary confinement expose them to a substantial risk of serious harm. Yes, again, because it's obvious. With respect to the subjective element, this wouldn't completely satisfy the subjective element, but to the portion of the subjective element that requires the Department of Corrections secretary or director or a prison warden to know that placing a prisoner with serious mental illness in solitary confinement exposes them to this harm, that a holding of the Court on this issue would satisfy that aspect. As I understand what happened in the district court, the district court really didn't address those issues head on. It did not, Your Honor. Is that right? Correct. Just dismissed it under Ockball and whatever. As we point out, Your Honor, we had difficulty discerning exactly what the basis for the court's dismissal was. Thorough ruling was hard to follow. Yes, it was, Your Honor. I think that is a fair statement. We noted and actually one of the other defendants in the case noted that there appeared to be some significant confusion at the district court level. Nonetheless, we can affirm on any grounds that was raised in the record below. You can affirm on any grounds, Your Honor. Why don't you tell us why, as you started out to do, why the complaints states, you know, at least a plausible claim for deliberate indifference in the way in which the prison system is treating. We think it's far more than just plausible, Your Honor. Let's go to the objective element first. Again, is viewed objectively as placing prisoners with serious mental illness expose them to a substantial risk of serious harm. Yes, it does, Your Honor. We cite numerous sources in our brief. The amicus brief from the National Disability Rights Resource Network collects a whole slew of sources. We cited these sources, some of these sources in our complaint and then also in our pre-suit letter, the letter that gave these officials all the notice of what was going on. Some of the things that we cited, the National Commission of Correctional Health Care Standards. These are standards of an organization this prison sought certification from. Their standards say, inmates who are seriously mentally ill should not be confined under conditions of extreme isolation. So you allege in the complaint that they're doing that? Correct. We allege it in the complaint. We also cite from the Society of Correctional Physicians who state that placing these prisoners in solitary confinement violates basic tenets of mental health treatment. So objective standard appears to be clearly satisfied here. And again, Your Honor, we think given the volume of literature out there on this, people at the highest level of the prison and the prison system have no basis for not knowing this. It has to be obvious to them. If it's not, they're sticking their heads in the sand, which is not permissible under the Eighth Amendment. Counsel, could you help me out on this? What is the, what do the prison officials say is the reason why they're doing this? We don't know why they say they're, why the top officials say they're doing it. In the individual instances that we cite in the complaint, we cite the stories of nine prisoners. And I mean, obviously, each story varies a little bit. But what you see is a pattern of what appears to be prisoners being placed in solitary confinement because of behavior that seems related to their mental illness. You know, the ways in which they act out and can't be controlled, or in particular, maybe the most disturbing is some of the acts of self-harm that you see. I mean, some of the acts alleged in our complaint with these prisoners are just unbelievable. We've got one prisoner who's had 30 stomach surgeries, apparently, because he habitually swallows razor blades and pins and things like this. And you didn't have any discovery in this case, right? We had document discovery, Your Honor. We did not get to depositions. You didn't have depositions? Correct. Right. And again, it was not decided by summary judgment on evidence. It's on the allegations? It's strictly on the pleadings, Your Honor. It's a little unusual that you've got a case that's already a year into the process where there have been previous pleadings, and you're confronted with a motion to dismiss. But to the extent, one of the arguments that the defendants make is, look, we haven't shown any ongoing violation. All this stuff seemed to happen in the past. Well, that's not true, Your Honor. In our amended complaint, we did use the benefit of some of the discovery we took. And one of the things we discovered was that there was another prisoner, Matthew Brandemil, his story is told at length in our complaint, who had suffered from what appears to be serious mental illness, who was placed in solitary confinement repeatedly, and then ultimately dies in solitary confinement of an apparent suicide. Does the record tell us, as it currently stands, how many prisoners in the Montana prison system have serious mental illness? No, it doesn't, Your Honor. And one of the issues, this isn't in the pleadings, but at this point, it's very difficult to tell. The prison itself doesn't, as far as we could tell during discovery, doesn't keep records of that. But I think, I believe what we do plead is there are 1,500 or 1,600 prisoners in general in the Montana State Prison, and there's only one, I think it's 1,500 or 1,600, and there's only one state prison in Montana. This is it. They have some private prisons, but this is the whole prison system as far as the state goes, state administered goes. And I think in our complaint, we alleged there were about 270, 275 prisoners on the mental health roster. Now, they may not all have, you know, extreme forms of mental illness, but it's a significant percentage of people in the prison have mental illness, which, frankly, isn't a surprise. I mean, I think that the literature on that is very well known. So is there a substantial risk of harm? Yes. Are prisoners in the Montana State Prison being subjected to that substantial risk of Yes. Again, we have nine stories in our complaint that show all of this in detail. We've got several prisoners who were actually sentenced by Montana State courts as guilty but mentally ill. It's a unique designation under Montana law. I think a few other states have it. But essentially, the prisoner is guilty of the crime charged, but because of a mental disorder, I think is the term used in the Montana statute, the prisoner didn't appreciate the criminality of the acts. So they're sentenced guilty but mentally ill, but when they go to the Montana State Prison, that designation seems to be ignored. The person that we have instances where psychiatrists were denying that the person had a mental illness. We've got Sean Morrison, for example, sentenced guilty but mentally ill, but the prison staff found he had, quote, no mental health history that would preclude placement in solitary confinement. Third, are the defendants themselves, the DOC secretary and the prison warden, the two defendants in this case, are they subjectively aware that they're subjecting prisoners with serious mental illness to serious harm? One, again, we think it is because for those people at that high of a level, it's obvious at this point based on the literature. But more directly, we told them so. Before we filed the complaint, my co-counsels, the ACLU, submitted a 40-page letter to the Department of Secretary Director laying out all of the allegations to make in our complaint and more, laying out in detail what we thought was going wrong there. And the defendants don't deny that. In their brief, they say the letter was a blueprint for our original complaint. They say we cut and pasted from that letter. And the defendants, nowhere in their brief do they, you know, they don't deny that they received the letter. They don't deny that they read the letter. What they seem to be arguing is that, well, the contents of the letter just weren't enough to put us on notice of this issue. And that, to me, is just completely unsustainable given the, just the incredible detail that we went into with the multiple examples that we cited. We also lay out some other customs and practices. I mean, this is, I think, solitary confinement is the primary and the, just the clearest issue of a problem at the prison. But this is fundamentally a system that is broken from top to bottom. This prison does not know how to deal with prisoners with serious mental illness. We've got evidence, we've got allegations about them punishing prisoners for behavior that's a product of their mental illness, refusing to diagnose prisoners as having mental illness, denying them medication, and failing to review the diagnosing and prescribing practice of the mental health staff. So it's the solitary confinement plus much, much more, Your Honor. And with that, I see my ten minutes is up. Thank you. Thank you. May it please the Court. My name is Tom Leonard. I'm representing the Montana Department of Corrections. The district court correctly dismissed this case under Rule 12b-6 because DRM failed to allege sufficient factual matter to state a plausible Section 1983 claim. Unfortunately, I don't read the district court's oral decision as saying that. I much would have preferred a written decision from the district court. The district court from the bench made certain statements that were indeed confusing. But as Your Honor just noted, this court can confirm on any grounds supported by the record. And the district court granting of our motion is supported by the record before the court today. We don't dispute that DRM's complaint is lengthy. In some respects, it's even detailed. But Twombly and Iqbal require non-conclusory factual content as to each essential element of an asserted claim. Well, there's a lot of facts alleged in their complaint. There are certain facts, Your Honor. That's true. And we don't dispute that the complaint contains certain non-conclusory factual allegations. And the bulk of those are contained on pages 15 through 30 of the complaint. And these are the so-called representative examples. And what these do is they recount the experiences of nine different inmates over a nine-year period. And for purposes of pleading, of course, those allegations are taken as true. But for purposes of proving deliberate indifference, those allegations don't mention the warden a single time. They mention the director once. And I'll talk about that some more in a minute. But a closer examination of the factual content reveals that it relates to isolated instances of conduct by prison staff, not final policy makers, and in particular, the practices of a prison psychiatrist who retired over four-and-a-half years ago. Now, that being said – The criteria for solitary confinement? I'm sorry? What's the criteria in Montana prison systems for solitary confinement? The criteria, Your Honor, is the – unfortunately, the placement of prisoners in solitary confinement is sometimes required for various security and custodial considerations. But those standards – this is a Rule 12b-6 case, and those standards really aren't outlined in DRM's complaint and were limited to the four corners of the complaint for purposes of Rule 12b-6. And I'd acknowledge that deliberate indifference, as Mr. Simmons noted, can be alleged in a couple of different ways. It can be alleged through direct allegations of a defendant's actual knowledge, and it can also be alleged by pointing out a deficiency that's so obvious and so blatant that the court can merely infer deliberate indifference. In Foster v. Runnels, for instance, this court determined that the repeated denial of meals to an inmate was sufficiently obvious. In Simmons v. Cook, the inmate's condition as a paraplegic and wheelchair-bound was obvious, as was the fact that the wheelchair couldn't make it to the food tray slot and there were no rails on the toilets. Importantly, by contrast, in the Harrelson v. Dupnick case, the court determined that the prolonged segregation of a juvenile inmate with serious mental illness was not so obvious as to simply infer deliberate indifference. And even in the case cited by DRM earlier this week, it submitted a case in a notice of supplemental authority, the Palakovich case. In that case, the Third Circuit noted a growing body of scientific literature about the harms of solitary confinement, and that's something we don't dispute. But the Third Circuit did not find that that made the risk so obvious that deliberate indifference could simply be inferred. Instead, it went on to examine the specific allegations of the defendant's knowledge in that case, and those included allegations that the defendants were aware of statistics that in their facility over 80% of the suicides and almost all of the self-harm occurred in locked housing units. The defendants were subjectively aware of a Department of Justice investigation looking into the very deficiencies at issue in that lawsuit, and that investigation ultimately determined that there were systemic violations ongoing at the prison. Obvious circumstances are missing from this complaint. What we have instead are the experiences of nine inmates over a nine-year period with various prison staff. And here, I think, is the important distinction. Merely alleging generally that defendants were aware of risks that may be associated with mental health, whether that be through the use of locked housing, the use of behavior modification plans, or inadequate mental health treatment. That's not enough because you can say that about every correctional official in the United States in every case having anything to do with mental health. Instead, what's required, DRM must show that there's a specific policy or custom in place at the prison that's so obviously deficient that it need not provide any allegations of subjective knowledge. But even accepting DRM's allegations is true, that there's this growing body of scientific literature, a growing national consensus about the harms of solitary confinement. At most, that shows that this is a complex issue. It's an issue that's under scientific evaluation. It's an issue that's in transition, and that's antithetical to the very idea that it's obvious. Counsel, if I could ask you this question. Is there a written policy of the Department of Corrections that states how they deal with mental illness? And if so, is it in the record? Your Honor, there are a number of policies that deal with issues relating to mental health, locked housing, behavior modification plans, mental health treatment. But, again, this is a Rule 12b-6 motion. So going on DRM's complaint, DRM does allege that it's provided allegations of actual knowledge of the defendants. And, of course, one of the easiest ways to do that is to point out a written policy that's unconstitutional on its face. But your policies, as I understand you, the policies that the system has are not now in the record because the suit was dismissed on the pleadings on the complaint. That's correct, Your Honor. Now, that being said, DRM does mention one written policy in the complaint, so I should be clear about that. And the allegation is that this written policy is unconstitutionally inconsistent because it uses the term serious mental health problems as opposed to the term serious mental illness. But there's no allegation that that inconsistency ever has or ever could lead to an inconsistency in treatment, much less a deprivation of federal rights. So would it be helpful to the district court in finding a rational approach to this issue to have before it all of the written policies in these various areas that you've mentioned? Perhaps, Your Honor, but to get there, DRM first needs to present a Chwambli and Iqbal-compliant complaint. And I should point out that if anyone should be able to do that, should be able to put together a complaint that complies with that pleading standard, it's Disability Rights Montana. Disability Rights Montana is an authorized protection and advocacy program in Montana. And that being the case, it has almost unfettered access to inmates and their records, and it's had that access for years. So if the information is there, DRM should have been able to set it out in its complaint, and it failed to do so even after multiple opportunities, after the district court warned DRM that it needed to do better and needed to add meat to the bone, so to speak, in the complaint. You said at the outset that the complaint only made reference to the warden once? No, Your Honor, and I apologize if I misstated that. The complaint only references the director once in the so-called representative examples on pages 15 through 30 of the complaint. Well, I understand the complaint, the way it's crafted. When they identify the parties, they identify the plaintiffs, then they identify the defendants, and they say, well, throughout this complaint we're going to refer to the warden and the director as DOC defendants. Then there's repeated references that the DOC defendants knew this or did that or whatever. There's repeated references that the defendants were aware of various policies and customs in place at the prison, but those are conclusory allegations, and what the court has to do is focus in on the factual content, and that's what I'm saying is that when you go to the part of the complaint that has the factual content, there's one reference to the director, and the reference is that there's a grievance process in place that includes the option of an appeal to the director, and prisoners regularly file grievances relating to their mental health. But most of those allegations do is show. So did the district court ever make it clear what allegations were missing from the complaint? Well, it did. They can't leave to amend. I mean, it looks like they can just clear up the complaint. They just need some additional facts. Prior to the motion to dismiss hearing where the district court actually dismissed this case, there was a hearing, a status hearing, in which the court determined that the allegations against the Department of Public Health and Human Services should be filed as a separate lawsuit, and the court also made very clear that there were allegations missing from DRM's complaint, that it probably wasn't compliant with Twombly and Iqbal, and the district court directed DRM to go amend its complaint, to file a new complaint that met that pleading standard. Only after that. That's just kind of circular, but he didn't say in particular what was, you know, what aspect of the complaint was deficient? He did. He referenced the fact that some of the policies and customs alleged to exist in the complaint were based on mere conclusions, lacking in factual matter, and I think that's absolutely true. Is that advice or comment from the district court at that status hearing, is there a transcript of that so we can see exactly what was said? There is, Your Honor, and I believe it's part of the appendices submitted by the parties. I believe it's there for the court to review. Thank you. So going back to the factual allegations relating to deliberate indifference, the only factual content that mentions the director is that one of the nine prisoners, a man by the name of James Larson, filed a grievance and that he exhausted his administrative remedies through an appeal to the director. That's, again, the only time the director is even mentioned in these examples, but DRM doesn't tell us anything else. It doesn't tell us what the grievance was, what it allegedly put the director on notice of, or even what the ultimate disposition of the grievance was. Reference has been made to the NCCHC standards. DRM argues that deliberate indifference is somehow supported by allegations that the Montana State Prison applied for accreditation with the National Commission on Correctional Health Care. Now, I should point out that DRM was more forthcoming in its original complaint. In that complaint, it expressly alleged that accreditation had not only been sought, it had, in fact, been obtained, which is true. And accreditation includes the NCCHC's expressed determination that the Montana State Prison is in 100 percent compliance with its standards on mental health. So if the NCCH standards provided any notice to defendants at all, that notice was that they were in compliance with industry standards. Reference has also been made to a letter that DRM sent to Director Batista just before it filed this lawsuit. And that letter summarized allegations of seven unidentified prisoners whom DRM had interviewed. And the allegation is that DRM sent this letter, and to its knowledge no modifications have been made at the prison since that time. First of all, DRM's allegation that it lacks knowledge of any modifications only shows that it lacks knowledge of an ongoing policy or custom in place at the prison. But more importantly, the failure to make modifications doesn't necessarily rise to the conscious affirmative choice by a final policymaker that's required to prove deliberate indifference. Merely identifying wrongful conduct by prison staff in the past isn't enough unless there's allegations that the director or the warden actually knew that that conduct occurred, and that conduct was caused by a policy or custom in place at the prison. Next, there's an allegation that the defendants were deliberately indifferent because they had knowledge of two prior Montana cases, the Walker and the Kotka case. And these are cases from years ago. Neither of them involved Eighth Amendment violations. But as a result of those two cases, the prison was required under state law to make various modifications. And there's no allegations in the complaint that the prison failed to do so. For example, the first case, the Walker case, that was a post-conviction relief proceeding filed by a prisoner almost 15 years ago, and it primarily involved the unsanitary living conditions on a cell block where the prisoner was housed, something that's not at issue here. It did involve the use of behavior modification plans on the seriously mentally ill, but the Montana Supreme Court did not rule in that case that the use of BMPs is a per se violation of the state constitution. So DRM doesn't allege that defendants failed to implement any of the changes mandated by the Walker decision. And the same is true with the second case, the Kotka case. The allegation is that that case resulted in a settlement agreement seven years ago, and the prison was required to make changes. There's no allegations as to what those changes were, whether they were, in fact, made, or whether the state has somehow breached that settlement agreement. Running out of time, but briefly, in addition to deliberate indifference, DRM is required to show a policy or custom in existence at the prison. The easiest way to do that would be to prove a written policy exists that's unconstitutional and on its face, and I talked about that a little bit earlier. But there really is no written policy at issue in this case, so DRM is left to prove an unconstitutional custom. And as this court held in the Trevino v. Gates case, a custom must be founded on practices of sufficient duration, frequency, and consistency to constitute a traditional method of carrying out policy. DRM. Okay, counsel, I'll just mention you are over your time, but I'm going to let you go on if you want, but I'll add time to the appellant's clock. Thank you very much. Much appreciated, Your Honor. DRM alleges nine unconstitutional customs in its complaint, but they can really be grouped into two categories, inadequate mental health treatment and the improper use of locked housing. With respect to the first custom, DRM alleges there's a practice at the prison of refusing to diagnose prisoners with serious mental illness and refusing to provide those prisoners with the medications they need to treat their condition. But those customs, by DRM's own admission, are based exclusively on the psychiatric decisions of one psychiatrist who retired four and a half years ago. And it's well established that a mere difference of opinion on appropriate medical care does not give rise to deliberate indifference, and that's true even in a case that's brought directly against a medical professional himself. It's certainly true that the director and the warden aren't deliberately indifferent by failing to counterman the decisions of a licensed psychiatrist on matters of psychiatry. And with that, Your Honor, I'd respectfully request that this Court affirm the district court in all respects. Many thanks. We appreciate your argument. Thank you. We'll have rebuttal now. And add three minutes to the rebuttal time. Thank you, Your Honors. I think the defendants misunderstand what this case is about. We're not alleging that the DOC director or the prison warden said, send Matthew Brandemil to solitary confinement. We're not saying that the prison wardens told the psychiatrist not to diagnose James Larson as having serious mental illness. What we're saying is there were all these problems at the prison. Those are all looking backwards. They want to look backwards and say the warden and the corrections officer, you haven't proven or you haven't alleged that they were involved in these things that happened in the past. This case is looking forward. We're trying to stop future harm. What we're saying is we sent you a letter. We told you everything that's going on. You've got to get them to stop. And they haven't done it. And what my opponent said is, well, in our amended complaint, we allege that we lack any knowledge that there were any changes, and therefore that shows that we don't know that nothing's going, that these things are continuing to go on. That's absolutely not a fair reading of our complaint at all. As we discussed, discovery went on in this case. The case was pending for 12 months. Discovery was going on. The fact that we don't have any knowledge that anything's changed implicitly means everything's staying the same. And beyond that, that wasn't the only thing in our complaint. As I mentioned earlier, while the case was pending, Matthew Brandemil, a prisoner who we added in our amended complaint, whose story we added, he was thrown in. He had serious mental illness. He was thrown in solitary confinement, and he apparently committed suicide while he was in there. So these things are continuing to go on, and we have alleged that. With respect to the status conference, and, Your Honor, you asked if it's in the record. It's at page 206 of our excerpts from the record is that status conference. And, you know, I think my opponent said that the court had identified some things that were missing from our complaint. And I don't remember everything that was said there, but the one that I remember most prominently is that what the court thought was missing was he couldn't understand why we had allegations about dead prisoners in our complaint. He didn't understand how we could be representing the interests of dead prisoners. Now, to me, clearly, the reason why we mentioned the dead prisoners in the complaint is because it's evidence of the harm that's going on. So I don't know what allegation. Actually, the court suggested very strongly, I don't know if it was quite in order, but thought we should file eight. He ordered us to split the case in two, and he wanted us to bring a third suit on behalf of dead prisoners, which we did not do because that's not what our case is about. Those prisoners are evidence of the harm that's taking place. With respect to the allegation that this only relates, that the improper medical care claims only relate to the acts of one psychiatrist, first of all, that's not in the record. But beyond that, and we cover this in a footnote, it's not even accurate because the time period we cover is ten years. There are actually two psychiatrists serving at that time. There was one who was the one when we first filed the complaint, but there was another one prior to that. So these allegations span two chief psychiatrists at the prison. And finally, the Walker case. The Walker case that we cite does provide the prison with some notice that this is a substantial risk of harm because that was a cruel and unusual punishment case brought under the Montana State Constitution. Same standard as the Eighth Amendment. It's a federal law in the decision. It's a Supreme Court decision there. They found that the behavior management plans that we complain about here, that those plans constitute cruel and unusual punishment when they're used on prisoners with serious, on a prisoner, there's one prisoner there, on a prisoner with serious mental illness, and they ordered them to stop. With that, Your Honor, I'm so happy to answer any other questions you may have. I have no questions. Judge Pius, Judge Shack, I think that covers it. It's a very interesting and important case. Disability Rights, Montana. Shall we submit it? Was somebody going to talk about reassigning the judge? Well, I thought if you'd like that. No, I don't need to. Well, I'll just say we have a very strict standard on reassigning judges. We could have Mr. Raitt address it for a minute or two, but then I'll let the government respond to whatever's said. Good morning, Your Honor. I may have pleased the Court. Alex Raitt on behalf of the appellant, Disability Rights, Montana. I just briefly want to address the issue of reassignment to a different district court judge on remand. This is not a request that we make lightly, either in our briefing or in our argument this morning, but we want to emphasize the importance of this issue, because if you look at the complete record of the lower court proceedings, the excerpt of record from the status conference that the court set sua sponte, along with the transcript from the decision on the 12B6 motion, we believe that reassignment is necessary to preserve the appearance of justice pursuant to the Reyes factors. We're not talking about lifting one statement from the record. We're not talking about a dust-up between an attorney and the judge. We're not talking about a disagreement simply with the decision that the judge made on the motion to dismiss. What we are talking about is a complete transcript or lower court proceeding that reflects exceedingly unusual circumstances that allow the court to get to the level of using the Reyes factors in order to justify reassignment. There are four things that we believe the court should look at from the lower court proceeding, which flow directly to the Reyes factors. First, the court, during the initial status conference, noted that DRM's complaint may have been crafted in such a way as to maximize what is characterized as the shock value of the pleadings. This is directly analogous to the Reyes case as well as the Rivera case, where the lower court in those proceedings made statements that it believed that the parties were somehow attempting to improperly manipulate the court. Again, the second piece of evidence follows along the same lines. During the status conference, the court noted that the court is not to be a forum for engaging in some sort of public influence practice. In this situation, the plaintiffs adequately pled a very important case involving difficult issues that required factual allegations of the treatment of mentally ill prisoners by the Department of Corrections and the use of solitary confinement to punish them. Again, on the second Reyes factor, the appearance of justice, based on those two comments alone from the status conference, reassignment is merited. Third, if you look at the transcripts, and this goes to the first Reyes factor, would the court be willing or able to put out of its mind previously expressed opinions or decisions? If you look at the lower court transcript, when you look at the way that the court analyzed two cases that alleged very different constitutional violations, on one hand a case against the Department of Public Health and Human Services that alleged Fifth and Fourteenth Amendment violations, due process claims, with our Eighth Amendment claims against the Department of Corrections, which are at issue in the case at bar, the court in its analysis conflated those two decisions or those two constitutional standards. And it wasn't just the plaintiffs that brought this to the court's attention. It was the Department of Public Health and Human Services that filed a motion for clarification, and the court issued a one-page order affirming its original decision. And this, again, if you look at the Reyes factors, goes straight to the Hernandez Mesa case, where the court made the same finding, the Ninth Circuit made the same finding, that when an issue was brought to a district court judge's attention, that there was a clear and manifest error, and the court nevertheless decides to affirm its original reasoning, that demonstrates that the court may not be able to put out of its mind previously expressed opinions or holdings. And then finally, the court confused some critical terminology that is central to this case, that deals with serious mental illness as well as guilty but mentally ill. And so for those reasons, we respectfully request that on remand this case is reassigned to a different district court judge. Thank you, Your Honor. Thank you, Counsel. Now, I'm going to let the State respond for several minutes to the argument about the judge, if you could. Thank you. Thank you, Your Honor. Just very briefly, it's, of course, our position that the court shouldn't reach the issue of reassignment because the district court's ruling is supported by the record. But in any event, it seems evident to me that DRM merely disagrees with the district court's legal conclusions, and the U.S. Supreme Court's been very clear that judicial rulings alone almost never constitute a valid basis for reassignment. DRM's presented no evidence that there's any personal bias or unusual circumstances that would warrant reassignment. There's no indication that Judge Haddon would have substantial difficulty in putting any previously expressed views out of his mind, that he couldn't fairly preside over this case because Judge Haddon's rulings were, at the very least, reasonable, and he made no statements during the hearing. His comments at the motion to dismiss make no sense, really. I'm just going to tell you that. Okay. And Your Honor's referring to the fact that he appeared to mix up, to some degree, the concepts at issue in the case against. Yes. Yes. I would agree with that. But mixing up some statements, the court should recognize that at that hearing, the court was considering two motions. It was considering a motion at issue in the DPHHS case and a motion in the DOC case. But a review of the transcript, and the transcript, again, is in the record, reveals that the district court was, in fact, tracking everything, and the district court issues the rulings that he intended to issue. One more point on reassignment. I think DRM ignores an important aspect of it, and that's that reassignment would entail a great deal of waste and duplication. Judge Haddon presided over this case for about 16 months. We had two separate hearings. We had a preliminary pretrial conference. Judge Haddon issued substantive rulings. He also presided over the companion case against DPHHS, which the parties agreed contained common questions of fact with this case. That case is settled, though, right? That case is settled. But what I'm trying to say is Judge Haddon presided over that case, so he's very familiar with the facts and the issues in this case, and any gain from reassignment would be outweighed to a great degree by the needless waste and duplication. Thank you. Thank you, counsel. I want to say on behalf of the court we appreciate the spirited and skilled argument of all counsel, and the disability rights Montana case shall be submitted. And let me say I think we have two more cases to be argued, right? Yes. So we have Nicholson and victory process. So what we'll do, and unless one of my colleagues wants a break now, let's judge Pizer, Judge Chapp, want a break now, we'll argue Nicholson, and then we'll take a ten-minute break before victory process. We'll let these distinguished counsel depart for Montana and places farther.
judges: Gould, Paez, Jack